**UNITED STATES of America**

**v.**

**Francisco Jose ROMANO.**

**Crim. No. 74–475.**

United States District Court,
E. D. Pennsylvania.

Jan. 3, 1975.

Joseph M. Fioravanti, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Eugene H. Clarke, Jr., Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

Francisco Jose Romano was convicted at a trial without a jury of possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a). Before me is Romano's motion for a new trial based upon my refusal to suppress his statements and the fruits of a search made of the premises in which he lived.

On July 9, 1974, a United States Customs officer discovered seventy grams of cocaine secreted inside two Colombian newspapers addressed to a Jorge Pelaez and a Carlos Pelaez at a specific mail box located at the Philadelphia College of Textiles and Science. After replacing most of the cocaine with sugar, agents of the Federal Drug Enforcement Administration attempted a controlled delivery of the newspapers to their addressees. On July 19, 1974, the defendant, a student at the College, removed the newspapers from the mail box which was registered to him. He then went to his residence, a townhouse on the college campus that he shared with four other students.

After observing Romano enter the building, several agents, led by Group Supervisor Frank Wickes, gained admittance but found that the defendant had already left. Shortly thereafter, Romano returned. Agent Wickes immediately identified himself and stated he was investigating the mailing of Colombian newspapers to the College. He asked Romano for permission to search his room and began to inform him of his Miranda rights. The defendant interrupted Wickes, however, stating that he had already placed the papers in the mail. After Wickes finished advising the defendant of his rights, he asked him if he would show the agents where he had done so. Romano agreed and led the agents to a nearby postal box, but the newspapers were not found when it was opened. Agent Wickes immediately placed the defendant under arrest and repeated the Miranda warnings.

The agents and the defendant then returned to defendant's townhouse at which time Agent Wickes ordered another agent to search the outside of the building. The two Colombian newspapers were found in the lower portion of a drainpipe attached to the rear wall.

Subsequently, while the defendant was being processed at the Drug Enforcement Administration's office he made another statement to the effect that he was only an intermediary for a friend in Colombia. All he was supposed to do was change the address on the newspapers and mail them to New York City.

## I. Defendant's Statements to Federal Agents

The first issue facing the court is whether defendant's statements to Agent Wickes and other officers should have been suppressed.

After hearing the evidence, I concluded that a reasonable person in Romano's place would believe he was not free to leave when the agents identified themselves. I therefore held he was under custodial interrogation even before his formal arrest. See Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); Steigler v. Anderson, 496 F.2d 793, 798–799 (3d Cir. 1974); United States v. Hall, 421 F.2d 540 (2d Cir. 1969), cert. denied, 397 U.S. 990, 90 S. Ct. 1123, 25 L.Ed.2d 398 (1970).

Romano is a twenty-year old Colombian national who was attending college in Philadelphia. He had been in the United States for about one year. I concluded that the defendant understood his constitutional right to remain silent, have an attorney present at any questioning, have an attorney appointed if he could not afford one, and prevent the agents' searching his room. The agents' testimony that they gave Romano the Miranda warnings several times and that he understood them is uncontradicted.[1] The fact that the defendant refused permission to search his room while freely talking to the agents about receiving the newspapers leads me to infer that he understood his rights and voluntarily waived some of them.[2]

Defendant contends, however, his initial statement that he had mailed the newspapers, was made *before* he was given the Miranda warnings. On the other hand, two government agents tes-tified that the defendant interjected this comment while Agent Wickes was telling him his rights. After careful consideration I concluded that the agents' version was the more believable.

 In Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L. Ed.2d 694 (1966) the Supreme Court stated, "Voluntary statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Thus, there is no constitutional protection for a defendant's alibi statement that is voluntarily interjected and interrupts a law enforcement official during Miranda warnings even though the alibi proves hollow. See United States v. Vigo, 487 F.2d 295, 298–299 (2d Cir. 1973); United States v. Gaynor, 472 F.2d 899 (2d Cir. 1973). Cf. United States v. Cobbs, 481 F.2d 196 (3d Cir.), cert. denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973). It follows then that the claim by the defendant that he mailed the newspapers was admissible. Furthermore, the statement by defendant during his processing at the Drug Enforcement Administration headquarters concerning his involvement in a cocaine distribution system was also properly admissible since it was made after he had been warned of his rights.[3]

## II. Search and Seizure of the Colombian Newspapers

Defendant's second allegation of error was in my not suppressing the seizure of the Colombian newspapers from the drainpipe attached to the rear of the building in which he lived. Romano argues that the search was unreasonable since it was made without a warrant and did not fall within any recognized

---

1. The agents made a point of advising the defendant of his rights before interrogation, just after his arrest and after the newspapers were discovered. The reason, as expressed by Agent Wickes, was that he was "sort of Miranda shy." (N.T. 63)

2. Even though defendant was not advised of his rights in the exact words of Miranda or that they were read off some card or form I concluded that he was adequately advised of all his rights by words sufficiently clear and comprehensible. See United States v. Lamia, 429 F.2d 373, 375–376 (2d Cir.), cert. denied, 400 U.S. 907, 91 S.Ct. 150, 27 L.Ed.2d 146 (1970).

3. Even if defendant's original statements should have been suppressed, he does not suggest and I would not conclude that they would taint this second admission.

exception. Relying on Work v. United States, 100 U.S.App.D.C. 237, 243 F.2d 660 (1957), he contends the drainpipe comes within the townhouse's curtilage and therefore the protection of the Fourth Amendment.

Curtilage has been defined as "[T]he enclosed space of ground and buildings immediately surrounding a dwelling-house." Black's Law Dictionary 460 (Rev. 4th ed. 1968).[4] See W. Ringel, Searches & Seizures, Arrests and Confessions, § 280, at 361–62 (1972). The Third Circuit has in fact specifically approved the application of the Fourth Amendment to the curtilage of a dwelling. United States ex rel. Boyance v. Myers, 398 F.2d 896, 899 (3d Cir. 1968). See also Fixel v. Wainwright, 492 F.2d 480, 483 (5th Cir. 1974) ; United States v. Molkenbur, 430 F.2d 563, 566 (8th Cir.), cert. denied, 400 U.S. 952, 91 S.Ct. 244, 27 L.Ed.2d 258 (1972). However, exactly what the curtilage of a house encompasses is a more difficult question.

 Not every object near or attached to a dwelling is entitled to Fourth Amendment protection. Whether a place is within the curtilage depends upon the facts of the case. Rosencranz v. United States, 356 F.2d 310, 313 (1st Cir. 1966). Circumstances to be considered include the object's proximity to the dwelling, whether it is enclosed with the dwelling, and its use as an adjunct to the domestic economy of the dwelling's inhabitants. United States v. Minker, 312 F.2d 632, 634 (3d

Cir. 1962), cert. denied, 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 978 (1963). See Wattenburg v. United States, 388 F.2d 853, 857 (9th Cir. 1968).

The concept of curtilage has been significantly modified when applied to a multiple dwelling.[5] The Second Circuit, in United States v. Conti, 361 F.2d 153, 157 (2d Cir. 1966), vacated on other grounds, 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968), and United States v. Miguel, 340 F.2d 812, 814 (2d Cir. 1965), held that the lobby and hallways of a multiple dwelling, used in common by all the tenants, is not within the curtilage of the individual tenant.

 Mr. Romano lived in one of a row of townhouse-student residences on a college campus. Access to them is not restricted. In front there is a sidewalk and there are no impediments such as fencing, planting or shrubs to set them off from other areas of the campus. The public also has complete freedom of access to the back of these buildings. Any number of people could have walked up to the drainpipe, which was on the rear, outside wall, just as they could have walked up to the rear door. Salesmen, students, visitors, campus officials, and even policemen were able to approach the drainpipe without intruding upon the private areas of the dwelling for the pipe was as accessible to the passerby as it was to those who lived in the townhouse. I conclude, therefore, that the drainpipe was not part of the curtilage of defendant's residence.[6]

---

4. The word curtilage is derived from the Latin cohors (a place enclosed around a yard) and the old French cortilliage or courtillage which today has been corrupted into courtyard. Originally it referred to the land and outbuildings immediately adjacent to a castle that were in turn surrounded by a high stone wall. United States v. Vlahos, 19 F.Supp. 166, 170 n. 13 (D.Or.1937) ; Coddington v. Dry Dock Co., 31 N.J.L. (2 Vroom) 477, 485 (Ct.Err. & App. 1863) ; 7 Encyclopedia Brittanica 651 (13th ed. 1926). Today its meaning has been extended to include any land or building immediately adjacent to a dwelling. Usually it is enclosed some way by a fence or shrubs. See Fullbright v. United States, 392 F.2d 432, 434 n.

7 (10th Cir.), cert. denied, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968), 4 W. Blackstone, Commentaries *225, Noah Webster, An American Dictionary of the American Language 215 (15th ed. 1838) ; 1 Compact Edition of the Oxford English Dictionary 630 (1971).

5. With the advent of apartment living concepts based upon decisions of a rural oriented society have less force as stare decisis. W. Ringel, Searches & Seizures, Arrest and Confessions § 280.03, at 364 (1972).

6. Fixel v. Wainwright, 492 F.2d 480 (5th Cir. 1974), is distinguishable since the court specifically held that the enclosed yard in that case was not a common passageway

However, I am also mindful of the Supreme Court's admonition that "the Fourth Amendment protects people, not places." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L. Ed.2d 576 (1967). Thus, the scope of protection should be based upon the degree of privacy an individual should reasonably expect rather than the venerable concept of curtilage. Wattenburg v. United States, supra, 388 F.2d at 858. Constitutional protection must be afforded to those areas in which there is "a reasonable expectation of freedom from governmental intrusion." Mancusi v. DeForte, 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968). Of course, each case must be decided upon its particular facts, but a test adopted by the Fifth Circuit seems to strike the right balance: it holds that a search is valid if it does not extend into a part of the premises rightfully in the exclusive control of the one against whom the search is directed. United States v. Hughes, 441 F.2d 12, 17 (5th Cir.), cert. denied, 404 U.S. 849, 92 S.Ct. 156, 30 L. Ed.2d 88 (1971); Garza-Fuentes v. United States, 400 F.2d 219, 222 (5th Cir. 1968), cert. denied, 394 U.S. 963, 89 S.Ct. 1311, 22 L.Ed.2d 563 (1969). See United States v. Minker, supra.

On July 19, 1974, Romano's residence, Townhouse I, was occupied by five students, including the defendant. Each student had his own bedroom and study area over which he alone had complete control. However, all shared the use of the front and rear entrances, the hallways and stairs, the bathroom, living room, and kitchen. It is uncontested that Romano could have reasonably expected no governmental intrusion in his bedroom and study area since he had exclusive control over them.[7] Unfortunately, the other areas of the townhouse, including the drainpipe on the rear wall, were not within the exclusive control of the defendant and he could not have had any reasonable expectation of privacy when he placed the newspapers there. See United States v. Freeman, 426 F.2d at 1354; United States v. Minker, 312 F.2d 632, 634 (3d Cir. 1962).

Thus, I concluded that whether tested by the traditional concepts of curtilage, or by the more modern considerations of exclusive control, the newspapers seized from the drainpipe should not have been suppressed and were admissible against defendant.

There was no contention of any other error or that if the statements and fruits of the search were properly admissible, the evidence against the defendant was insufficient for conviction. Therefore, his motion must be denied.

---

used to gain access to the apartments. Furthermore, unlike this case, the yard was completely removed from the street and surrounded by a fence and was not an area open to salesmen or other businessmen who could approach tenants in the course of their trade.

7. See Piazzola v. Watkins, 442 F.2d 284 (5th Cir. 1971). See generally, Delgago, College Searches: Students, Privacy and the Fourth Amendment, 26 Hastings L.J. 57 (1974) for a valuable discussion of application of the Fourth Amendment to searches of student residences.