# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE, )
                          )     I.D. Nos.     2308015044
                          )                       2308015473
      v.                    )
                          )
                          )
RAHEEM FULLMAN,       )
                          )
      Defendant.        )

Submitted: February 15, 2024
Decided: April 24, 2024

## OPINION

### *Upon Defendant's Motion to Suppress*

### DENIED

Lindsay A. Taylor, Deputy Attorney General, Department of Justice, Dover, Delaware, *Attorney for the State*.

Cara M. Brophy, Esquire, Assistant Public Defender, Office of the Public Defender, Dover, Delaware, *Attorney for the Defendant*.

**Primos, J.**

Defendant Raheem Fullman moves to suppress all evidence found as the result of a warrantless seizure. For the reasons explained below, the motion is **DENIED.**

## FACTUAL BACKGROUND[1]

On August 28, 2023, at around 6:00 p.m.,[2] a past-proven reliable[3] confidential informant (the "CI") provided a tip directly to Detective Brian Holl of the Delaware State Police via text messages that Raheem Fullman was in possession of a firearm and residing in Brightway Commons apartment complex in Milford, Delaware.[4] The CI informed Holl that:

- Fullman was located at 108 Brightway Commons, sitting on the stoop in front of the building;[5]
- Fullman was on probation;[6]
- Fullman was in possession of a firearm, and the firearm was tucked into his waistband;[7]
- Fullman was residing with his girlfriend, who lived there;[8]
- Fullman was socializing with a large group of individuals who were drinking alcohol, including another probationer, Clyde Harris;[9] and
- Fullman was wearing a black jumpsuit and had dreadlocks.[10]

---

[1] The facts contained herein are taken from the Suppression Hearing that was held on February 15, 2024, the transcript of which is cited hereinafter as "Hr'g Tr. at __." There, the State supplied two Exhibits, both consisting of body camera footage ("BCF") of the encounter: State's Exhibit 1 is Detective Holl's BCF, cited hereinafter as "Ex. 1 at __ (Holl BCF)." State's Exhibit 2 is Detective Saccomanno's BCF, cited hereinafter as "Ex. 2 at __ (Saccomanno BCF)." Holl's BCF has no audio for the first minute; nonetheless, its visual depiction during that period is probative.

[2] Hr'g Tr. at 30:22.

[3] *Id.* at 17:22–18:4. The CI has provided Holl with at least ten prior tips that have all led to felony firearm convictions. *Id.* at 18:9–20, 30:17–20. Holl testified that the CI had never provided information that was unreliable or not actionable. *Id.* at 18:21–23, 19:1–3.

[4] *Id.* at 6:3–8:5, 18:3–4, 31:15–18.

[5] *Id.* at 19:13–16.

[6] *Id.*

[7] *Id.*

[8] *Id.* at 46:20–22.

[9] *Id.* at 19:19–20:6. Harris was on Level IV probation and wore an ankle monitor. *Id.* at 7:16–19, 12:7–8.

[10] *Id.* at 19:14–15, 35:7–8.

The CI also told Holl where to park at Brightway Commons and how to approach building 108.[11] The CI's motivation was to "enhance public safety in and around" the Brightway Commons community.[12]

Holl contacted Probation and Parole ("P&P") Senior Probation Officer David Angelo to conduct inquiries and to verify the tip's information.[13] Angelo ran a DACS check and confirmed that Fullman was on Level II probation out of Sussex County.[14] Angelo also confirmed that Fullman was on probation for drug possession and for violating his probation in a drug dealing case, and that he had just been released from incarceration for a firearms charge related to the possession case.[15] In addition, Holl reviewed a photograph of Fullman that matched the physical description provided by the CI.[16]

Holl and the CI remained in contact until 10:00 p.m.; once Holl arrived at Brightway Commons, the communications ceased.[17] Throughout the course of the investigation, Holl relayed all the information that the CI had provided him to the other members of the Governor's Task Force, which consisted of Holl, Detective Saccomanno, Sergeant Doughty, and Angelo.[18]

Brightway Commons is a high crime area.[19] Once there, Doughty was conducting surveillance from the rear of the apartment complex and relaying his observations to Holl.[20] Doughty could see the group socializing but could not

---

[11] *Id.* at 20:5–6.
[12] *Id.* at 19:8–10.
[13] *Id.* at 6:9–7:1.
[14] *Id.* at 6:23.
[15] *Id.* at 7:4–13.
[16] *Id.* at 23:5–8.
[17] *Id.* at 23:17–21, 24:23–25:2, 31:7–10.
[18] *Id.* at 24:13–14.
[19] *Id.* at 8:18; *see also id.* at 21:22–22:3 (describing Brightway Commons as an "open-air drug market where violent crimes occur … such as murder, shootings, assaults, rapes").
[20] *Id.* at 24:15–22.

identify any of the individuals.[21]  Saccomanno, Holl, and Angelo parked where the CI had recommended.[22]

At or around 10:00 p.m.,[23] Saccomanno, Holl, and Angelo approached the group by taking the route recommended by the CI, and Doughty approached separately from the rear of the complex.[24]  Saccomanno led the group of three officers, accompanied by his K9.[25]  Holl immediately recognized Fullman sitting on the steps leading up to the stoop.[26]  Angelo also immediately spotted Harris.[27] Saccomanno stated generally to the group around the stoop, "Nobody move."[28]  The group of bystanders was large and somewhat verbally aggressive, although generally compliant.[29]

Holl approached Fullman and requested that he stand.[30]  Fullman refused.[31] In contrast, Harris complied with Angelo's request to stand and approach him.[32] Holl, relatively quickly into the encounter, placed his hand on Fullman's right shoulder, grabbed Fullman's right wrist, and continued to request him to stand;

---

[21] *Id.*

[22] *Id.* at 20:5–6, 24:6–8.

[23] Although the BCF shows a different time, e.g., 21:53 (9:53 p.m.), Holl testified that that time was incorrect and that it was indeed 10:00 p.m. *Compare id.* at 26:16–22 *with* Ex. 1 at 0:04 (Holl BCF).

[24] Hr'g Tr. at 9:4–13, 24:15–18, 29:16–19.

[25] *Id.* at 26:23–27:2.

[26] *Id.* at 9:14–15, 25:4–6.

[27] *Id.* at 9:11–13.

[28] *Id.* at 27:1–2; Ex. 2 at 0:26–30 (Saccomanno BCF).

[29] Hr'g Tr. at 10:5–10 ("[D]ue to the large amount of people there I was kind of – you know, it was an officer safety concern.  So I was trying to watch everybody.  The crowd was being kind of verbally aggressive and giving us a hard time about what we were doing out there."); *id.* at 10:17–20 ("Other than, you know, verbally abusive or anything, expressing their frustration with police presence there, everybody else was compliant."); *id.* at 28:14–18 ("Generally yes … [W]e can hear the hostility towards them … but they were generally for the most part compliant.").

[30] *Id.* at 10:22–23; Ex. 2 at 0:36–44 (Saccomanno BCF).

[31] Hr'g Tr. at 10:21–23, 28:10–11.

[32] *Id.* at 9:16–10:13.

4

Fullman continued to refuse.[33] Doughty intervened by grabbing Fullman's left arm.[34] As Fullman was still sitting down on the stairs of the stoop, Holl placed a handcuff on Fullman's right wrist.[35] Holl and Doughty helped Fullman stand.[36] Once Fullman stood, his left wrist was also placed into handcuffs, and both wrists were secured behind his back.[37]

Angelo saw a firearm in Fullman's waistband as Fullman stood up: "[H]is shirt raised a little bit and I could see the clear handle of a firearm sticking out of the waistband of his pants, along with the impression of a barrel on his pant line."[38] Angelo immediately moved to secure the firearm.[39] Fullman was arrested and transported to Sussex Correctional Institute ( "SCI"), where, during the stripping process, two baggies of suspected crack cocaine were found on his person.[40]

On January 8, 2024, Fullman filed a motion to suppress (the "Motion"). On January 29, 2024, the State filed its response. On February 15, 2024, the Court held a suppression hearing.

## BURDEN OF PROOF

Generally, a defendant who moves to suppress evidence bears the burden of establishing that the challenged search or seizure violated his or her Constitutional rights.[41] For a warrantless search, however, the "State has the burden of proof of showing the propriety of the search,"[42] i.e., the legality of the search, by a

---

[33] *Id.* at 60:16–17; Ex. 2 at 0:43–2:12 (Saccomanno BCF).
[34] Hr'g Tr. at 11:4–6; Ex. 1 at 1:49 (Holl BCF); Ex. 2 at 2:07–12 (Saccomanno BCF).
[35] Ex. 1 at 1:52–54 (Holl BCF).
[36] *Id.* at 1:52–57; Hr'g Tr. at 11:4–6.
[37] Ex. 1 at 2:00–02 (Holl BCF).
[38] Hr'g Tr. at 11:7–10.
[39] *Id.* at 11:10–12.
[40] *Id.* at 63:6–8.
[41] *State v. Medina*, 2020 WL 104323, at *3 (Del. Super. Jan. 7, 2020).
[42] *State v. Henderson*, 906 A.2d 232, 235 (Del. Super. 2005). *See also Medina*, 2020 WL 104323, at *3; *State v. Garnett*, 2021 WL 6109797, at *3 (Del. Super. Dec. 23, 2021).

preponderance of the evidence.[43]  To survive a motion to suppress in a case involving a warrantless seizure, the State must satisfy the reasonable and articulable suspicion standard by showing specific facts "which, taken together with rational inferences from those facts, reasonably warrant the intrusion."[44]  The judge, as the trier of fact at a suppression hearing, determines the credibility of witnesses.[45]

## PARTIES' CONTENTIONS

Fullman argues that (1) law enforcement did not have reasonable and articulable suspicion to conduct a warrantless seizure of him, and (2) the seizure violated his reasonable expectation of privacy in the stoop as part of the curtilage of Brightway Commons.[46]  Conversely, the State argues that (1) the information obtained from the CI satisfied the reasonable and articulable suspicion standard because it was provided by a past-proven reliable informant and corroborated by law enforcement, and (2) the stoop of a multi-unit apartment complex is not part of the curtilage.[47]

For the reasons explained below, the Court agrees with the State on both issues.

## DISCUSSION

Under Delaware law, an investigative detention, or *Terry*[48] stop, is governed by 11 *Del. C.* § 1902.[49]  It is well settled that, if police officers have reasonable and

---

[43] *Garnett*, 2021 WL 6109797, at *3.
[44] *Backus v. State*, 845 A.2d 515, 517 (Del. 2004) (cleaned up).
[45] *State v. Nyala*, 2014 WL 3565989, at *5 (Del. Super. July 17, 2014).
[46] Def.'s Mot. to Suppress Evid. [hereinafter "Def.'s Mot."] ¶¶ 12–18.
[47] State's Resp. to Def.'s Mot. ¶¶ 9–16.
[48] *Terry v. Ohio*, 392 U.S. 1 (1968).
[49] In full, Title 11 Section 1902 provides that:
    (a) A peace officer may stop any person abroad, or **in a public place**, who the officer has **reasonable ground to suspect is committing, has committed or is about to commit a crime,** and may demand the person's name, address, business abroad and destination.

articulable suspicion that an individual is committing, has committed, or is about to commit a crime, they may stop that individual for investigatory purposes.[50] In determining whether reasonable and articulable suspicion exists, the Court looks to the totality of the circumstances, which is viewed through the eyes of a "reasonable, trained police officer in the same or similar circumstances, combining objective facts with an officer's subjective interpretation of those facts."[51]

When assessing an officer's articulation of the facts and his or her conduct, Delaware courts use a two-pronged test that looks at (1) the "objective observations and consideration of the modes or patterns of operation of certain kinds of lawbreakers" and (2) "inferences and deductions that a trained officer could make which might well elude an untrained person."[52] Generally, "the court defers to the experience and training of law enforcement officers."[53]

---

(b) Any person so questioned **who fails to give identification or explain** the person's actions to the satisfaction of the officer **may be detained and further questioned and investigated.**

(c) The total period of detention provided for by this section shall not exceed 2 hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime.

11 *Del. C.* § 1902 (emphasis supplied). Notably, in Subsection 1902(a), the term "reasonable ground" has been determined by the Delaware Supreme Court to mean "reasonable and articulable suspicion." *Jones v. State*, 745 A.2d 856, 861 (Del. 1999) [hereinafter *Jones (1999)*].

[50] *Miller v. State*, 25 A.3d 768, 771 (Del. 2011).

[51] *Id.*

[52] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1287 (Del. 2008) (quoting *Riley v. State*, 892 A.2d 370, 375 (Del. 2006)).

[53] *Flowers v. State*, 195 A.3d 18, 27 (Del. 2018) (quoting *Woody v. State*, 765 A.2d 1257, 1262 (Del. 2001)).

**I.** **FULLMAN WAS SEIZED WHEN THE OFFICERS APPROACHED BECAUSE A REASONABLE PERSON IN HIS POSITION WOULD NOT HAVE FELT FREE TO IGNORE THE POLICE PRESENCE.**

Whether a police officer has reasonable and articulable suspicion to conduct a *Terry* stop requires a threshold finding of when, specifically, the stop took place.[54] "A person is considered to be 'seized' when, in view of the surrounding circumstances, a reasonable person would not feel free to leave,"[55] i.e., where law enforcement communicates to a reasonable person that he or she is not at liberty to ignore the police presence and go about his or her business because of law enforcement's use of physical force or show of authority.[56]

The "question of whether a seizure occurs under article I, section 6 of the Delaware Constitution 'requires focusing upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence.'"[57] The Delaware Supreme Court has adopted a non-exhaustive list of totality of the circumstances factors established in *United States v. Scheets*[58]:

    **i.** Whether the encounter occurred in a public or private place;
    **ii.** Whether the suspect was informed that he was not under arrest and free to leave;
    **iii.** Whether the suspect consented or refused to talk to the investigating officers;
    **iv.** Whether the investigating officers removed the suspect to another area;
    **v.** Whether there was physical touching, display of weapons, or other threatening conduct; and

---

[54] *Jones (1999)*, 745 A.2d at 861 ("The question of when a seizure has occurred is perhaps the most critical issue."); *Woody*, 765 A.2d at 1263; *Purnell v. State*, 832 A.2d 714, 719 (Del. 2003); *Lopez-Vazquez*, 956 A.2d at 1286–87.

[55] *Medina*, 2020 WL 104323, at *4.

[56] *Lopez-Vazquez*, 956 A.2d at 1286; *Hall v. State*, 981 A.2d 1106, 1111 (Del. 2009).

[57] *Jones v. State*, 28 A.3d 1046, 1051 (Del. 2011) [hereinafter *Jones (2011)*] (quoting *Jones (1999)*, 745 A.2d at 869).

[58] 188 F.3d 829, 836–37 (7th Cir. 1999), *cert. denied*, 528 U.S. 1096 (2000).

**vi.** Whether the suspect eventually departed the area without hindrance.[59]

Fullman argues that he was seized at the moment Saccomanno approached the stoop and stated to the group of bystanders, "Nobody move."[60] The Court agrees. Fullman was seized at that moment because any reasonable person would not have felt free to ignore the police presence in a situation in which a police officer stated "Nobody move" while approaching with a trained K9 at 10:00 p.m. at night, surrounded by a group of armed police officers with flashlights.[61]

Thus, given the determination that law enforcement had seized Fullman once the statement "nobody move" was made, the issue now becomes whether the officers had reasonable and articulable suspicion, either before or at that moment, to conduct a *Terry* stop of Fullman. Because the CI supplied the tip to Holl before the *Terry* stop, the analysis begins there.[62]

---

[59] *Jones (2011)*, 28 A.3d at 1052–53 (cleaned up) (citing *Scheets*, 188 F.3d at 836–37).

[60] Def.'s Mot. ¶ 12.

[61] *See, e.g.*, *Hall*, 981 A.2d at 1111 (finding a seizure when a detective parked car behind suspect and blocked him in, then approached the car and gave an order); *Riley*, 892 A.2d at 374 (finding a seizure when police approached with badges and flashlights after having parked police vehicle behind suspect's vehicle to prevent suspect from driving away). Moreover, even if Saccomanno's general statement "nobody move" did not effectuate a seizure, Fullman was seized seconds later when Holl placed his hand on Fullman's right shoulder and grabbed his right wrist. Ex. 2 at 0:44 (Saccomanno BCF).

[62] *See Lopez-Vazquez*, 956 A.2d at 1287 ("[T]he courts consider the totality of the circumstances known to the officer at the time of the stop.").

9

## II. THE CI'S TIP SUPPLIED REASONABLE AND ARTICULABLE SUSPICION.[63]

In evaluating whether an informant's tip provided reasonable and articulable suspicion, the Court looks to (1) the reliability of the informant, (2) the specificity of the informant's tip,[64] and (3) the degree to which the tip is corroborated by independent police surveillance and information.[65]

Under the totality of the circumstances, the officers had reasonable and articulable suspicion, based on the past-proven reliable CI's tip and independent police surveillance and information, that criminal activity was taking place to conduct a *Terry* stop of Fullman.

### A. The CI Was Past-Proven Reliable.

"An informant's tip may provide reasonable suspicion for a stop and seizure where the totality of the circumstances, if corroborated, indicates that the information is reliable."[66] Merely referring to the informant as past-proven reliable, or a conclusory allegation that describes an informant's past performance as

---

[63] The specific criteria for whether an informant's tip satisfies reasonable and articulable suspicion or probable cause are similar but not identical. Probable cause is a higher, more stringent standard. Nonetheless, there is no reason why the Court should not apply the benchmarks established for probable cause based upon an informant's tip, whether in analyzing a warrantless arrest or a search warrant. *See Brown v. State*, 897 A.2d 748, 751 (Del. 2006) (determining probable cause for a warrantless arrest based on informant's tip, the Supreme Court looked to (1) the reliability of the informant, (2) the details contained in the tip; and (3) the degree of independent police corroboration); *Holden*, 60 A.3d at 1115–16 (same). *Cf. Valentine v. State*, 207 A.3d 566, 572 (Del. 2019) (using essentially the same test in the context of a search warrant but inserting "basis of knowledge" for the second prong).

[64] *Miller*, 25 A.3d at 771. Although *Valentine* is the more recent decision, *Miller* dealt with a **known** tipster and whether there was **reasonable and articulable suspicion** for a *Terry* stop, not whether there was probable cause for a search warrant. *Id.* at 771–74. Therefore, the Court follows *Miller*'s precise language even as the Court generally applies the benchmarks established for probable cause to the case *sub judice*. Whether the Court uses the "specificity" terminology utilized in *Miller*, the "basis of knowledge" terminology utilized in *Valentine*, or the "details contained in the tip" terminology utilized in *Brown* and *Holden*, the analysis is the same, that is, whether the substance of the tip supplied by the informant establishes personal knowledge in specific detail.

[65] *Id.* at 771–72.

[66] *Id.* at 771.

credible, does not establish reliability.[67]  Instead, something more is needed, e.g., that the investigation of prior tips corroborated their accuracy or led to convictions.[68]

In *Miller v. State*,[69] the Delaware Supreme Court evaluated whether a tip satisfied the reasonable and articulable suspicion standard.[70]  The Court found that it did.[71]  Notably, the informant in *Miller* was *not* past-proven reliable.[72]  The Court, however, noted that "the informant's tip was more reliable than the information of a one-time anonymous caller" because the informant had "made contact with [the] Detective [ ] on multiple occasions, … suggest[ing] … familiarity between the police and the informant."[73]

As in *Miller*, the CI and Holl had a working rapport[74]:  the CI had communicated with Holl on multiple occasions prior to the tip regarding other investigations[75] and had Holl's phone number to contact him.[76]  Moreover, this case is stronger than *Miller* because, here, the Court finds that the CI is past-proven reliable: the CI had provided at least ten prior tips to Holl that had led to convictions, most involving firearms, and none of the tips had later been found to be inaccurate.[77]

---

[67] *See Valentine*, 207 A.3d at 572 ("But such a conclusory allegation regarding the informant's past performance is problematic because it interferes with the issuing magistrate's ability to make an independent determination regarding the informant's reliability."); *see also id.* at 572–73 (noting the United States Supreme Court's holding in *Aguilar v. Texas*, 378 U.S. 108 (1964), which found that a "mere conclusion" describing the informant as a "credible person," was insufficient to establish credibility); *id.* at 573 (noting the holding of the United States Supreme Court in *Spinelli v. United States*, 393 U.S. 410 (1969), that an affidavit had no support where it only described the informant as "credible" and his information as "reliable").

[68] *Id.* at 572.

[69] 25 A.3d 768 (Del. 2011).

[70] *Id.* at 771–74.

[71] *Id.* at 774.

[72] *Id.* at 769.

[73] *Id.* at 773 (footnote omitted).

[74] *See id.*; *see also* Hr'g Tr. at 17:22–19:3.

[75] Hr'g Tr. at 18:9–17.

[76] *Id.* at 31:15–18.

[77] *Id.* at 18:9–19:3.  *Compare Purnell*, 832 A.2d at 720 (finding that the informant was known personally by the police officer and had given reliable information in the past) (citing *Adams v.*

**B. The CI's Tip Was Sufficiently Detailed.**

"[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum than would be required if the tip were more reliable."[78]  By the same token, therefore, if a tip is more reliable, less information is required to establish reasonable articulable suspicion.[79] Consequently, as this Court has observed in a non-published decision, if the informant is past-proven reliable, the tip needs only to have "a certain amount of detail" and not a "heightened level of detail."[80]

In *Culver v. State*[81] and *Sierra v. State*,[82] the Delaware Supreme Court took issue with the tips in question because they provided information that failed to show personal knowledge of the suspect and criminal activity, and the information could have been readily observable from the street.[83]  Here, there has been no evidence presented that shows how the CI obtained the information about Fullman's possession of a firearm, or how the CI knew (or knew of) Fullman, i.e., the CI's basis of personal knowledge to supply the tip.[84]  Nonetheless, the absence of first-hand

---

*Williams*, 407 U.S. 143, 146 (1972)), *with Valentine*, 207 A.2d at 572 ("The detectives' affidavit … said nothing about the manner in which the informant had proved to be reliable in the past (*e.g.*, investigation of prior tips corroborated their accuracy or led to convictions).").

[78] *LeGrande v. State*, 947 A.2d 1103, 1109 (Del. 2008) (quoting *Jones (1999)*, 745 A.2d at 871).

[79] *See Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion, like probable cause, is dependent upon both the content of the information possessed by police and its degree of reliability.  Both factors—quantity and quality—are considered in the 'totality of the circumstances[.]'" (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981))).

[80] *State v. Johnson*, I.D. No. 2204003342, at 4:2–7 (Del. Super. Nov. 28, 2022) (TRANSCRIPT) (D.I. 22).

[81] 956 A.2d 5 (Del. 2008).

[82] 958 A.2d 825 (Del. 2008).

[83] Although both cases involved Department of Correction P&P Procedure 7.19, their reasoning, as with the probable cause benchmarks, remains useful here:  in *Culver*, "[t]he tip was based upon readily observable facts [from the street] that demonstrated no special insight into illegal activity." 956 A.2d at 12.  In *Sierra*, "the tip only provided observable information." 958 A.2d at 831.

[84] *See Culver*, 956 A.2d at 13 ("Nothing about the tip demonstrated any personal connection between the caller and [the suspect] and, thus, no credible opportunity for the tipster to have personal knowledge of illicit activity.").

and personal knowledge can be excused where, as here, the tip contains sufficient detail that dispels the concern that the tip is a casual rumor "circulating in the underworld" or based on a suspect's general reputation.[85]

By way of example, the Delaware Supreme Court in *Purnell v. State*[86] dealt with the issue currently before the Court, i.e., whether there was reasonable and articulable suspicion for the police to conduct a *Terry* stop based on a past-proven reliable informant's tip that the suspect was engaging in criminal activity.[87] There, the Supreme Court distinguished *Purnell* from *Jones (1999)*, where an *anonymous* tipster had provided a tip indicating merely that there was a "'suspicious black male wearing a blue coat' in the vicinity."[88] The *Purnell* Court explained that the case before it was distinct from *Jones (1999)* because the informant was past-proven reliable in addition to the tip's supplying a detailed description of what each suspect male was wearing, the activities in which they were engaging, and the vicinity where they were located.[89]

Here, the tip provided *some* general information that could have been observable from the street, e.g., a description of Fullman's physical appearance, activity, and location.[90] The informant in *Purnell* similarly provided information regarding the race, clothing, and location of the suspect; moreover, the suspect was walking from a different direction than that described by the informant.[91]

---

[85] *Valentine*, 207 A.3d at 574. The Court also notes that providing details regarding how the CI obtained the information could jeopardize the CI's safety. *Cf.* Hr'g Tr. At 44:15-22 (Holl's testimony that details regarding the CI's tip were omitted from the police report to protect the CI).
[86] 832 A.2d 714 (Del. 2003).
[87] *Id.* at 718–20.
[88] *Id.* at 720 (citing *Jones (1999)*, 745 A.2d at 858, 873–74).
[89] *Id.* at 716, 720.
[90] Hr'g Tr. at 19:13–16, 35:7–8.
[91] 832 A.2d at 717–20.

Nonetheless, the *Purnell* Court found that reasonable and articulable suspicion had been established.[92]

Tellingly, the CI in this case provided additional information that could not have been merely observed from the street, e.g., Fullman's name, that he was on probation, that he resided with his girlfriend at Brightway Commons, and that he had a firearm concealed in the waistband of his pants, as well as where the officers should park and the best route to take in approaching 108 Brightway Commons on foot.[93] This additional information is more than enough to satisfy reasonable and articulable suspicion. A lower quantum of information has satisfied probable cause, as shown *infra*.

In *King v. State*,[94] the Delaware Supreme Court affirmed this Court based on similar facts. There, the defendant argued that the police did not have probable cause for a warrantless arrest, let alone reasonable suspicion for a *Terry* stop and frisk.[95] A detective received a phone call from a past-proven reliable confidential informant that there was "a black male wearing a black baseball cap and cut-off jeans at a card table on South Kirkwood Street who was in possession of a large amount of crack cocaine."[96] The police immediately went to the area described, which was "an open air drug market," spotted the defendant who matched the description, and arrested him.[97] The Supreme Court reasoned that, under the totality of the circumstances, probable cause was "clearly established" because a past-proven reliable informant had supplied the tip and detectives then observed the defendant at the scene.[98]

---

[92] *Id.* at 720.
[93] Hr'g Tr. at 56:21–58:11.
[94] 633 A.2d 370, 1993 WL 445484 (Del. Nov. 1, 1993) (ORDER). Supreme Court Orders may be cited as precedent. *New Castle Cnty. v. Goodman*, 461 A.2d 1012, 1013 (Del. 1983).
[95] *King*, 1993 WL 445484, at *1.
[96] *Id.*
[97] *Id.*
[98] *Id.* at *2. As the Supreme Court explained,

14

Accordingly, in a situation in which a past-proven reliable informant initiates communication and supplies a tip that includes a matching description of the defendant, his location, and the criminal activity, this satisfies the specificity requirement under the second prong, especially when there is independent police corroboration at the scene.

## C. The Tip Was Bolstered By Independent Police Surveillance and Information.

It is important to consider "not only specific facts and conditions existing at the time of the informant's tip but also whether the tip includes references to future actions that are not ordinarily easily predicted."[99] This is because it shows that the informant knows the person well enough to predict future behavior.[100]

Here, the CI has knowledge of Fullman's future actions and movements. The CI knew *when* Fullman could be found by officers (August 28, 2023, from 6:00 p.m. *through* 10:00 p.m.),[101] precisely *where* he could be found (on the front stoop at 108 Brightway Commons), and his activity during that time (socializing with a large group that included Harris).

Moreover, where, as here, if "police can corroborate predictive information regarding the defendant's movements and behavior, [then] the informant's

---

The informant, who had provided similar information which had proven reliable on numerous occasions in the past, provided Detective Balke with: (1) a description of an individual which matched that of King, (2) a location known to be a drug area and (3) information that the person was in possession of a large amount of cocaine.

*Id.*

[99] *Miller*, 25 A.3d at 771 (citing *Illinois v. Gates*, 462 U.S. 213, 245 (1983)).

[100] *Id.* at 772 ("only a small number of people are generally privy to an individual's itinerary"); *Holden*, 60 A.3d at 1116 ("Corroboration of an informant's tip about a suspect's movements suggests that the informant possesses knowledge of the suspect's criminal behavior, because the informant knows the person well enough to know what they will do.").

[101] The initial tip was provided around 6:00 p.m. The seizure did not occur until around 10:00 p.m. The CI knew that Fullman would still be there around 10:00 p.m. and consistently corroborated that information for four hours.

credibility is bolstered."[102]   Even if nothing is known about the informant's credibility, independent police work can sufficiently corroborate the tip.[103]

Law enforcement first sought to corroborate the information of the CI's tip prior to arriving at Brightway Commons.  The CI initiated communications with Holl via phone around 6:00 p.m.[104]  Holl then verified Fullman's name, probationary status, and description with Angelo.[105]

Officers next corroborated the CI's tip through independent surveillance.  The officers knew that Brightway Commons was a high crime area.[106]  Doughty observed the social gathering from a safe distance in the rear of the apartment complex.[107]  Although he could not see clearly, he could discern a group of individuals congregated near the stoop engaging in the activity described by the CI, i.e., drinking alcohol.[108]   He relayed this information to the other officers.[109]   All the law enforcement officers who were present at Brightway Commons knew what Holl had learned from the CI and through the course of the investigation.[110]

---

[102] *Miller*, 25 A.3d at 772 (citing *Alabama v. White*, 496 U.S. 325, 332 (1990)); *LeGrande*, 947 A.2d at 1108.

[103] *LeGrande*, 947 A.2d at 1108.

[104] Hr'g Tr. at 31:11–16.

[105] *Id.* at 23:5–8.  While it does not appear that Holl was able to verify with Angelo the portion of the CI's tip regarding Fullman's residence at Brightway Commons, this does not preclude a finding that reasonable and articulable suspicion was established.  In *Purnell*, the Court found reasonable and articulable suspicion despite the fact that the suspect approached from a different direction than that indicated by the informant.  832 A.2d at 720.

[106] Hr'g Tr. at 8:18, 21:22–22:3.  The fact of a suspect's being in a high crime area does not, on its own, establish reasonable and articulable suspicion.  *See Jones (1999)*, 745 A.2d at 871 ("Reasonable and articulable suspicion cannot be based on a defendant's presence in a particular neighborhood at a particular time of day with no independent evidence that the defendant has committed, is committing or is about to commit a crime.").  It is, nevertheless, a factor to consider as part of the totality of the circumstances in a reasonable and articulable suspicion analysis. *Woody*, 765 A.2d at 1265 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

[107] Hr'g Tr. at 24:15–22.

[108] *Id.*

[109] *Id.* at 24:19–21.

[110] *Id.* at 24:13–14.

The officers further corroborated the tip when they approached the stoop and observed Fullman. Holl immediately spotted Fullman, who matched the description provided by the CI and confirmed by Angelo.[111] Importantly, the verification of Fullman occurred before the order "nobody move." Thus, at the latest, reasonable and articulable suspicion was satisfied at the moment Holl spotted Fullman, thus independently verifying the veracity of the tip.[112]

Once confronted, Fullman refused to stand up although ordered to do so by the officers.[113] When he was eventually brought to his feet by the officers, Angelo saw a firearm tucked in his waistband.[114] Upon seeing the firearm, Angelo seized it.[115]

---

[111] *See Purnell*, 832 A.2d at 720 ("[The suspect] matched the description given by an informant who had given reliable information in the past …. He was also in the general vicinity" that the informant described). Although Harris was also wearing all black and had dreadlocks and was sitting on the top of the stoop behind Fullman, Harris immediately rose and stood next to Angelo when the officers approached before Holl interacted with Fullman. Ex. 2 at 0:25–43 (Saccomanno BCF).

[112] The officers were unable to corroborate, prior to seizing Fullman, that he had a firearm in his waistband, as he was seated when they approached him. However, the CI's past-proven reliable status coupled with the officers' corroboration of the other details clearly satisfies the reasonable and articulable suspicion standard. *See, e.g.*, *Purnell*, 832 A.2d at 721 (finding that officers had reasonable and articulable suspicion to conduct a *Terry* frisk because past-proven reliable informant supplied a tip that the suspect was armed and because of the officers' prior experience).

[113] Hr'g Tr. at 10:21–11:1.

[114] *Id.* at 11:4–12.

[115] *Id.* at 11:10–12. It is unclear whether Fullman was patted down prior to Angelo's seizure of the firearm. The BCF does not show this one way or the other. Regardless, the firearm was clearly seen. Given the totality of the circumstances, the Court finds no improper police conduct.

Fullman has not argued that Holl's handcuffing of Fullman's right wrist while Fullman was seated, and the subsequent handcuffing of his left wrist after Fullman was brought to his feet by the officers, converted the seizure into a warrantless arrest, which would have required probable cause. As the Delaware Supreme Court has observed, an investigatory stop does not turn into a full arrest merely because the officers use handcuffs, provided, however, that the police conduct is reasonable. *Flowers*, 195 A.3d at 25; *accord Womack v. State*, 296 A.3d 882, 891 (Del. 2023). In any event, the Court finds that it was reasonable for officers to secure Fullman with handcuffs when he refused to stand as directed, where officers had been warned by a past-proven reliable informant that Fullman was carrying a firearm in his waistband. Moreover, even if these actions did convert the seizure into an arrest, the probable cause standard would likely have been satisfied by the CI's tip and the subsequent corroboration of it, given the Delaware Supreme Court's decision in *King*, *supra*.

Fullman was arrested and transported to SCI, where additional contraband was found on his person.[116]

Given the totality of the circumstances, the State has met its burden of showing specific facts that reasonably warranted the *Terry* stop by a preponderance of the evidence based on the past-proven reliable CI's tip and independent police corroboration.[117]  Therefore, all contraband discovered as a result of the stop, including the firearm and the cocaine, were legitimately obtained and are not subject to suppression.

## III.  THE STOOP OF A MULTI-UNIT APARTMENT COMPLEX PROVIDES NO REASONABLE EXPECTATION OF PRIVACY AS PART OF THE CURTILAGE.

Fullman argues that the stoop is a "private place" that is part of the curtilage of Brightway Commons and, therefore, his reasonable expectation of privacy was compromised by the *Terry* stop.  As a result, all evidence found on his person there, and during his intake at SCI, must be suppressed.  The State argues that the stoop of a multi-unit apartment complex is not part of the curtilage.  The Court agrees with the State.

Delaware looks to four factors when determining if an area lies within the curtilage:

    **i.**    The proximity of the area that is claimed to be curtilage to the home;
    **ii.**    Whether the area is in an enclosure surrounding the home;
    **iii.**    How the resident uses the area; and
    **iv.**    The efforts undertaken by the resident to protect the area from observation.[118]

---

[116] Hr'g Tr. at 63:6–8.

[117] *King*, 1993 WL 445484, at *2 ("Under the totality of the circumstances, when police arrived at the scene and saw King, who matched the description, they had probable cause to arrest him[.]").

[118] *State v. Chapman*, 2019 WL 2209092, at *4 (Del. Com. Pl. May 22, 2019) (cleaned up) (citing *State v. Guardarrama*, 2016 WL 7235694, at *4 (Del. Super. Dec. 14, 2016), *aff'd*, 179 A.3d 865, 2018 WL 619856 (Del. Jan. 18, 2018) (ORDER)).

The State provides no Delaware authority that addresses whether a stoop of a multi-unit apartment complex is (or is not) part of a resident's curtilage. Instead, the State refers to *Lease v. Tyler*,[119] a Middle District of Pennsylvania decision. There, the court reasoned that "[t]he concept of curtilage has been significantly modified when applied to a multiple [unit] dwelling,"[120] and that "[b]ecause of the number of residents and guests visiting a multiple-occupancy residence," there is no justified expectation of privacy, just as there would not be with a common yard or parking lot open to the public.[121]

This Court agrees with the reasoning in *Tyler* and sees no reason that a public stoop such as the one here should be considered part of the curtilage. Thus, the Court definitively holds that the stoop of a multi-unit apartment complex provides no reasonable expectation of privacy as part of the protected curtilage.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is **DENIED.**

**IT IS SO ORDERED.**

Noel Eason Primos, Judge

NEP/tls
*Via Email*
oc: Prothonotary
cc: Counsel of Record

---

[119] 2008 WL 2673381 (M.D. Pa. June 30, 2008).
[120] *Id.* at *6 (first alteration in original) (quoting *United States v. Romano*, 388 F. Supp. 101, 104 (E.D. Pa. 1975)).
[121] *Id.*