Phillip PURNELL, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 671,2002.

Supreme Court of Delaware.

Submitted: May 20, 2003.
Decided: Sept. 16, 2003.

John S. Malik, Wilmington, DE, for Appellant.

Timothy J. Donovan, Jr., John Williams (argued), Department of Justice, Wilmington, DE, for Appellee.

Before VEASEY, Chief Justice, BERGER and STEELE, Justices.

VEASEY, Chief Justice:

In this appeal, we consider the validity of a second search following a lawful *Terry*[1] stop. Here, a police officer conducted a pat-down search incident to a *Terry* stop and found no weapons. Later, the officer conducted an additional search, without consent, after the pat-down had been concluded. The record shows that the purpose of the additional search was not to protect the officers, but to gather evidence. The Superior Court denied the defendant's motion to suppress the fruit of the second search. We reverse on the ground that the search violated the suspect's Fourth Amendment right that protects individuals from unreasonable searches and seizures. Any evidence gathered pursuant to this second search should have been suppressed as fruit of the poisonous tree.

### Facts

On November 9, 2001, at approximately 4:00 p.m., the police received a tip from a confidential informant who had supplied reliable information in the past. The informant told an officer that two black males were standing on the corner of Fourth and Delamore Streets in Wilmington and were in possession of narcotics and handguns. The informant also provided information on the clothing the two men were wearing. One man was wearing

---

1. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

black pants and a black three-quarter length jacket partially made out of leather. The jacket had white writing on the back. This man was said to have held the drugs. The second man wore a three-quarter length jacket made entirely of leather. The informant stated that this man was Shannon Black. He also wore a black hat trimmed in red with white writing on the front. Black was said to have had a handgun in his waistband and possibly had drugs in his possession as well.

After receiving the tip, Detective Vincent Jordan and two other undercover officers immediately drove to the area the informant had identified. Upon arrival, the detectives were unable to locate the two men in the vicinity. The officers decided, however, to circle the block looking for the two individuals. A half-block from the area identified by the informant the officers noticed a man entering a Chinese restaurant. The man fit the description given by the informant of the unidentified man. The man had on a three-quarter length jacket with leather sleeves and white writing on the back. Detective Jordan testified that the man was not walking to the restaurant from the vicinity of Fourth and Delamore. Rather, he was walking from the opposite direction. Also, at no time did it appear to the detectives that the man was doing anything unusual or suggestive of criminal activity.

After a moment the man emerged from the Chinese restaurant. As the man walked out of the restaurant the three officers approached him, identified themselves, escorted the man to their unmarked car and told him they were investigating a complaint regarding handguns and narcotics. The man was later identified as the appellant, Phillip Purnell. The detectives asked Purnell if they could speak with him, and he agreed. The police then asked if they could pat him down for weapons, and he again agreed.

One of the officers conducted the pat-down but found no weapons. The officer did, however, detect a large bulge in Purnell's right pants pocket. When asked what the bulge was, Purnell stated it was approximately $300 in cash that he had earned from a temporary job. Purnell then gave consent for the detective to remove the money from his pocket. Detective Jordan testified that the money was "very crumpled up in disarray" and appeared to total more than $300.

After the search, the officers asked Purnell to provide identification and state his business abroad. Purnell produced valid identification and told the detectives that he was visiting his grandmother. He then pointed down the street to a house the police believed to be vacant. The officers also asked Purnell how he had traveled to his grandmother's house. Purnell responded that he had taken the bus. This aroused the detectives' suspicions, however, because during the pat-down the officer felt what he believed to be a remote control automobile keypad in Purnell's jacket. The officers then conducted a second, nonconsensual search of Purnell and removed the keypad from his jacket. Purnell told the officers that the keys belonged to his grandfather's Buick which he had permission to drive.

Parked on the street near the house Purnell had pointed to was a black Buick. The detectives asked Purnell if the vehicle was his or his grandfather's. Purnell stated that it was neither his nor his grandfather's. The officers then walked toward the car and pressed the keypad they had taken from Purnell. The doors of the car unlocked. The detectives then locked the car and requested a K-9 unit to conduct a search of the vehicle. The officers also

ran a license plate check of the vehicle and found that it was registered to Purnell.

The detectives detained Purnell until the K–9 unit arrived. Upon arrival a drug-sniffing dog alerted to the presence of drugs in the car. The officers then towed the car and transported Purnell to the Wilmington Police Station.

At the station the officers ordered Purnell to remove his jacket. As he removed his jacket a small bag of marijuana fell from the left sleeve of the jacket. A further search of Purnell also revealed four more small bags of marijuana. Purnell was read his *Miranda*[2] rights. He then made a statement admitting that he purchased five small bags of marijuana from an unknown black male. He also stated that the Buick belonged to him and that there was more marijuana in the trunk of the car. The officers then obtained a warrant to search the car where they discovered in the trunk a large quantity of marijuana and, in the passenger area, plastic bags used to package marijuana for sale.

Purnell was indicted on charges of Possession with Intent to Deliver Marijuana,[3] Maintaining a Vehicle for Keeping Controlled Substances,[4] Possession of a Controlled Substance Within 300 Feet of a Park,[5] and Possession of Drug Paraphernalia.[6] Purnell filed a motion to suppress evidence. At the conclusion of the suppression hearing, the court denied the motion.

Then Purnell entered into a Stipulated Trial Agreement with the State whereby he waived his right to a trial and admitted to having committed the charged offenses.

Purnell did, however, preserve his right to appeal the order denying the motion to suppress. The court then sentenced Purnell to the mandatory minimum term of three years for the Possession with Intent to Deliver Marijuana charge. On the remaining charges he received probationary sentences. Purnell now appeals the sentence that resulted from the denial of his motion to suppress.

## Issue on Appeal

Purnell makes one argument on appeal: that the trial court erred by denying his motion to suppress the evidence seized pursuant to the stop. He asserts three reasons for error: (1) the totality of the circumstances did not establish reasonable and articulable suspicion of criminal activity; (2) the keys used to search his vehicle were seized in violation of his rights; and (3) the search of his vehicle, by unlocking the car doors with the keypad, was performed without a warrant in violation of his rights. The State asserts that the search was valid and that the trial court properly denied the motion.

We review for abuse of discretion the trial court's refusal to grant a motion to suppress evidence.[7] Thus, the judgment is reversible only if "this Court finds the Superior Court's decision to be clearly erroneous."[8]

## Reasonable and Articulable Suspicion to Stop

A trial court's determination whether a police officer possessed reason-

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. DEL CODE ANN. tit. 16, § 4752 (2001).

4. DEL CODE ANN. tit. 16, § 4755 (2001).

5. DEL CODE ANN., tit. 16, § 4768 (2001).

6. DEL CODE ANN. tit. 16, § 4771 (2001).

7. *Woody v. State*, 765 A.2d 1257, 1261 (Del. 2001).

8. *Id.*

able and articulable suspicion to stop a person is an issue of law and fact.[9] In this case the facts are not in dispute. Therefore, this aspect of the issue is reviewed de novo.

Purnell contends the police officers did not possess reasonable and articulable suspicion to stop and question him. The State argues that the stop was proper. To determine whether the stop was proper this Court must first examine the point at which Purnell was stopped. Then we must determine whether the officers had reasonable and articulable suspicion at that time to make the stop.[10]

▮▮▮ A stop occurs when a police officer displays conduct that "would communicate to a reasonable person that he or she was not free to ignore the police presence."[11] Under the Fourth Amendment to the United States Constitution a seizure " 'requires *either* physical force ... *or*, where that is absent, *submission* to the assertion of authority.' "[12] Here Purnell was approached by the police officers after he left the Chinese restaurant. After approaching Purnell, the officers advised him that they were investigating a complaint regarding handguns and narcotics. They then asked Purnell if he wished to speak with them and he agreed. Afterward, the officers escorted Purnell to their unmarked vehicle.

▮▮▮ In *California v. Hodari D.* the United States Supreme Court ruled that submission to the assertion of authority constitutes a seizure.[13] Purnell submitted to the officers' authority when he followed them to their car. Furthermore, a reasonable person probably would not have believed he or she was able to leave after agreeing to speak with the officers and being escorted to the officers' car. Thus, a stop occurred at this point, and this Court must determine whether the officers had reasonable articulable suspicion to make the stop.

▮▮▮ In certain circumstances, "law enforcement officers may stop or detain an individual for investigatory purposes, but only if the officer has reasonable articulable suspicion to believe the individual to be detained is committing, has committed, or is about to commit a crime."[14] Reasonable and articulable suspicion is a less stringent standard than the probable cause standard and requires a quantum of proof that is less than preponderance of the evidence.[15] In determining whether reasonable and articulable suspicion exists a court "must examine the totality of the circumstances surrounding the situation 'as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts.' "[16] Courts will defer to the

9. *Jones v. State*, 745 A.2d 856, 860 (Del.1999). (*Jones* was decided under the Delaware detention statute and the Delaware Constitution, but for this purpose the analysis under the United States Constitution is the same.)

10. *Id.* at 863.

11. *Id.*

12. *Id.* at 862 (quoting *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).

13. *Hodari D.*, 499 U.S. at 626, 111 S.Ct. 1547.

14. *Woody*, 765 A.2d at 1262.

15. *Id.* at 1263.

16. *Id.* (quoting *Jones*, 745 A.2d at 861 (citing *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981))).

experience and training of police officers.[17]

In this case Purnell matched the description given by an informant who had given reliable information in the past. Purnell was wearing the black jacket with the white writing on the back and the black pants described by the informant. He was also in the general vicinity of the area where the informant had stated that the crime occurred. Although Purnell was seen walking from a direction opposite from the area identified by the informant, he was, nevertheless, in the vicinity.

In *Adams v. Williams,* the United States Supreme Court found that a tip provided by an informant was sufficient to justify a stop where the informant was known personally by the officer and had given reliable information in the past.[18] The Court held that the circumstances surrounding the stop present "a stronger case than obtains in the case of an anonymous telephone tip."[19] Specifically, the Court ruled that "the information carried enough indicia of reliability to justify the officer's forcible stop."[20]

In *Jones v. State* this Court did not find that reasonable articulable suspicion existed from an informant's tip.[21] *Jones,* however, involved merely a tip from an anonymous caller who stated that there was a "suspicious black male wearing a blue coat" in the vicinity.[22]

The informant in Purnell's case was known to the police as a source of reliable information. Furthermore, the informant gave a detailed description of what each of the males was wearing and the activity they were engaging in. The officers spotted Purnell, who matched the description of the unidentified man given by the informant. Considering the totality of the circumstances, the officers did possess reasonable articulable suspicion to stop Purnell, given that he matched the description provided by the informant and was in the vicinity stated by the informant. Therefore, the trial court properly found that there was reasonable articulable suspicion to stop Purnell.

### Seizure of the Keys

Purnell asserts that the officers' search and seizure of the keys in his jacket was an illegal search and seizure, in violation of his constitutional rights under the Fourth Amendment to the United States Constitution. The State argues that the search was proper.

Pursuant to a brief stop of an individual an officer "may conduct a limited protective search for concealed weapons."[23] This is known as a *"Terry* search."[24] "[T]he purpose of a *Terry* search is 'not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.' "[25] "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous,

17. *Id.* at 1262.

18. *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

19. *Id.*

20. *Id.* at 147, 92 S.Ct. 1921.

21. *Jones,* 745 A.2d at 873–74.

22. *Id.* at 858.

23. *Adams,* 407 U.S. at 146, 92 S.Ct. 1921.

24. *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

25. *Hicks v. State,* 631 A.2d 6, 11 (Del.1993) (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)).

he may conduct a weapons search limited in scope to this protective purpose."[26]

 As noted, a permissible search for weapons is very limited. " '[I]f the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.' "[27] Therefore, a search outside of the scope of the limitations of a *Terry* stop is illegal.

In *Hicks v. State* an officer detained a woman in her car, in a residential driveway, for a traffic violation. Soon after the stop, a crowd gathered around the officer and the woman in the car. Of the members of the crowd, one man, the defendant Hicks, was extremely close to the officer and was constantly asking the officer questions.[28] Hicks also kept his hands concealed in his pocket. The officer was apprehensive and concerned about his exposure to harm from Hicks. The officer asked Hicks to leave, but he refused. At this point the officer detained Hicks and conducted a pat-down search for weapons. The officer felt a large bulge which the officer thought might be a weapon. The officer removed the object and discovered it was a green pouch. After opening the pouch the officer found it contained money and a sandwich bag.[29] Knowing that drugs are frequently packaged in sandwich bags the officer seized the pouch and decided to examine further its contents to determine if it concealed drugs.[30] The officer later found drugs in the pouch.[31]

On appeal, Hicks argued that the officer's conduct was illegal, asserting that the stop and pat-down were impermissible, as was the seizure and search of the pouch.[32] This Court held that the stop and pat-down of Hicks were legal,[33] but that the reexamination of the contents of the pouch violated state and federal constitutional law. Specifically, we held that, "Once the pouch was removed, seized and inspected by the arresting officer, no reasonable basis remained to believe that Hicks was presently armed and dangerous."[34] Thus, a reexamination of the pouch was held to be outside the scope of the protective search.

 In this case the officers conducted two searches of Purnell. The first was a search for weapons. The Superior Court correctly found that this search was proper. The informant had relayed to the officers that the men were armed. Furthermore, the officers knew from experience that people who deal in drugs are often armed. Thus, the officers were justified in searching Purnell for weapons to protect themselves.

 The second search occurred after the officers knew that Purnell was unarmed. In ruling on the legality of this search the trial court found:

The defendant was then asked how he got there. He said he came by bus. The officers [sic] who conducted the pat-down thought he had felt keys or keypad in the defendant's pocket. Asked to see

27. *Hicks*, 631 A.2d at 11 (quoting *Dickerson*, 508 U.S. at 373, 113 S.Ct. 2130).

28. *Id.* at 7–8. Hicks was the woman's boyfriend but did not mention this to the officer.

29. *Id.* at 8.

30. *Id.*

31. *Id.*

32. *Id.* at 9.

33. *Id.* at 10.

34. *Id.* at 11.

it. Defendant showed it to him. And it's the keys to a Buick.

\* \* \*

But, as I said, in any event, the Court has no evidence that there was any demand that the keys be given up. And the evidence is that the defendant freely and voluntarily gave them up.[35]

The Court's findings are inaccurate and not clearly supported by the record. The testimony of Detective Jordan revealed two things. First, his testimony was not definite on whether the officers received permission to search for the keys. He stated only that he "believe[d]" they asked to continue the search. Second, Detective Jordan did not recall whether permission was given to seize the keys.[36] The record also revealed that the police report explicitly indicates that permission was given to conduct the first search and that Purnell gave permission for them to seize the money. The report does not state, however, that they received permission to conduct the second search or that Purnell gave permission for them to take the keys.

The State argues the seizure of the keys was proper and cites this Court's decision in *Mosley v. State.*[37] In *Mosley*, an officer noticed a piece of plastic protruding out of the defendant's brassiere during the course of a pat-down search in connection with a drug deal. After noticing the plastic, the female officer believed it to contain narcotics so "she placed her hand over the area and felt a 'rocky substance' that she suspected was crack cocaine."[38] The officer seized the object and determined that the plastic bag appeared to contain crack cocaine. Mosley was then arrested.

On appeal Mosley argued that the seizure of the drugs was illegal. Citing *Minnesota v. Dickerson*[39] as controlling, we disagreed, holding that, "a police officer may seize non-threatening contraband detected during a pat-down search if the identity of that contraband is immediately apparent from plain sight or plain touch."[40]

In *Dickerson* the United States Supreme Court ruled that contraband may be seized without a warrant where the contraband is in plain sight. The Court based its holding on a prior case, *Horton v. California.*[41] Specifically, the *Dickerson* Court cited *Horton's* holding that if "the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.*, if 'its incriminating character [is

---

35. Trial Transcript at 104.

36. The record states:

Purnell's Attorney: Okay. Now, with the renewed interest—and, again, not to beat this to death—but with the renewed interest in the car keys, the affidavit of probable cause, and I don't think the report as well nor the affidavit of probable cause for the arrest indicates that Mr. Purnell was asked for permission to go into his jacket pocket to retrieve the keys.
Is it your testimony today that he was asked permission to go into his pocket to retrieve the keys?
Detective Jordan: I believe they asked to continue their search. Whether there was permission granted for the keys, that I don't

recall. I know he specifically gave permission to take the money out. The keys, I don't recall.
Trial Transcript at 45–46.

37. No. 451, 1998, 748 A.2d 407, 2000 Del. Lexis 90 (Del.2000) (ORDER).

38. *Id.* at 407, 2000 Del. Lexis 90 at \*2.

39. 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

40. *Id.* at 407, 2000 Del. Lexis 90 at \*3.

41. *Dickerson*, 508 U.S. at 375–76, 113 S.Ct. 2130 (citing *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)).

not] "immediately apparent," ' the plain-view doctrine cannot justify its seizure."[42]

The State's argument in support of the second search fails for several reasons. First, the keys were not seized during the pat-down search but during a subsequent search. The officers did not have authority to conduct this second search because the first search revealed that Purnell did not have any weapons. Thus, the second search was not for the purpose of protecting the officers.

Second, the incriminating character of the keys was not "immediately apparent." The officers had no reason to know whether the keys were linked to the Buick. Even if the officers did suspect that the keys belonged to the Buick, it was still not "immediately apparent" that the Buick contained drugs. Thus the keys were not of an "incriminating character." Furthermore, the State cannot support its argument by contending that because Purnell stated he had taken the bus, the officers knew he was lying and the keys incriminated him on this point. Detective Jordan admitted during his testimony that Purnell could have had the keys in his possession and still could have taken the bus. Thus, this reason also does not give the keys an "incriminating character."

Finally, in this context one cannot reasonably describe car keys as "contraband." Webster's Dictionary defines contraband as "goods or merchandise the importation, exportation, or sometimes possession of which is forbidden."[43] The cases that the State cites all deal with instances where a police officer felt or saw drugs, or what the officer believed to be drugs. Clearly, drugs are contraband. In Purnell's case, however, the officers felt keys and a keypad, which they clearly believed to be keys and a keypad. Neither keys nor a keypad, in this situation, are contraband. The State's reliance on *Mosley* and *Dickerson*, therefore, lacks merit.

■ A search pursuant to a *Terry* stop is conducted for the limited purpose of protecting the officer by determining if the person stopped has weapons. The officers in this case knew from the first search that Purnell was not in possession of weapons. After Purnell stated that he took the bus to the area the officers conducted a second search. This was not a search for weapons. Rather, it was a search for evidence.[44] The record indicates that the State does not have proof that Purnell gave permission to conduct this search or to remove the keys from his pocket. Given that *Terry* searches may be conducted only for a limited purpose, Purnell's right to be protected from an unreasonable search and seizure was violated by the officers' second search. The trial court, therefore, abused its discretion by denying Purnell's motion to suppress the evidence that was based on the illegal search and seizure of the keys.

### Warrantless Search of the Vehicle

■ Purnell contends that the officers conducted a warrantless, and thus illegal, search of his vehicle by unlocking the doors to the Buick. We find no need to

42. *Id.* at 375, 113 S.Ct. 2130 (alteration in original) (quoting *Horton*, 496 U.S. at 136, 110 S.Ct. 2301) (citing *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)).

43. Webster's Third New International Dictionary 494 (8th ed. 2002).

44. In *Adams* the United States Supreme Court stated, "The purpose of this limited search is *not to discover evidence of crime,* but to allow the officer to pursue his investigation without fear of violence...." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (emphasis added).

address this issue, as all evidence obtained as a result of the search and seizure of the keys is fruit of the poisonous tree and should have been suppressed.[45]

### Conclusion

Accordingly, the judgment of the Superior Court is **REVERSED**.

---

45. *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (holding that "evidence seized during an unlawful search could not constitute proof against the victim of the search" (citing *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914))).