# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE )
       )
      v. )     ID: 2312007369
       )
MARVIN R. SWANSON, )
       )
      Defendant. )
       )

Date Submitted: June 7, 2024
Date Decided: July 19, 2023

## <u>MEMORANDUM OPINION</u>

### *Upon Defendant's Motion to Suppress*:
### DENIED

Jillian L. Schroeder, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware. *Attorney for the State of Delaware.*

John S. Edinger, Esquire, Office of Defense Services, Wilmington, Delaware. *Attorney for Defendant*.

**Adams, J.**

## I.    INTRODUCTION

On August 22, 2023, at 1:25 p.m., the Wilmington Police Department ("WPD") observed Defendant in an incriminating Instagram video purportedly showing a gun visible on Defendant's hip. Within minutes, WPD received a tip from a past proven reliable confidential informant regarding the same Instagram video, which prompted a search and detention of Defendant. The search of a trash can, performed within 20-30 feet of where Defendant was standing, uncovered a gun. After taking Defendant to the police station, Defendant gave the officers consent to take his DNA. Defendant's DNA was later matched to the gun. WPD then arrested Defendant for Possession of a Firearm by a Person Prohibited and Possession of Ammunition by a Person Prohibited. Defendant now moves to suppress the evidence, including Defendant's consent to DNA testing and the gun, arguing WPD lacked reasonable articulable suspicion to stop Defendant. For the following reasons, Defendant's Motion to Suppress is DENIED.[1]

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On August 22, 2023, Wilmington Police Detective Anthony Lerro ("Lerro"), while conducting routine surveillance,[2] observed a video posted on Marvin

---

[1] A jury trial is set to begin in this matter on July 29, 2024.

[2] Lerro described "routine surveillance" as "monitor[ing] social media" by "go[ing] on the social media platform, Instagram, and [] click[]ing through multiple different peoples' profiles from their stories" including their pages, live videos, and posts. *State v. Swanson*, I.D. No. 2312007369, at 8:3–11 (Del. Super. June 7, 2024) (TRANSCRIPT) [hereinafter "Tr. at _"].

Swanson's (the "Defendant") Instagram stories.[3] The video was posted at 12:58 p.m. on August 22, and Lerro screen recorded[4] it at 1:25 p.m.[5] The video displayed Defendant, who is a person prohibited, in the area of 23rd and Jessup Street wearing a white bucket hat, a black hoodie with Rick and Morty symbols, and ripped jeans held up by a Louis Vuitton belt.[6] Lerro testified based on his "training and experience" that Defendant, at the 32 second mark of the Instagram video, was shooting a fake gun.[7] At the 57 second mark, Defendant then lifted his hoodie to reveal what Lerro believed to be a magazine or handle of a firearm in Defendant's waistband.[8] Lerro indicated the "Nike" brand on Defendant's clothing was obstructed by the magazine or firearm, and in Lerro's experience, it is "common" for individuals to hold a gun in that particular spot in their waistband.[9]

At 1:50 p.m. that same day, a past-proven reliable confidential informant (the "CI"[10]) texted Lerro a screen recording of the same Instagram video, and told Lerro

---

[3] Tr. at 7:14–16, 11:23–12:7. Lerro identified Defendant's Instagram based on the account's handle "Lamont_Margeez" and by identifying Defendant in the pictures posted from that account based on Lerro's past personal observations of Defendant. *Id.* at 8:18–10:21.

[4] Lerro described "screen recording" as "an application on your phone in the settings that you can set up to screen record. It's almost like screen shotting. However, you click the button and it records whatever is on your screen." *Id.* at 13:1–5.

[5] *Id.* at 15:12–15.

[6] *Id.* at 12:2–7, 23:6–8; St.'s Ex. 6.

[7] Tr. at 20:3–21:9.

[8] *Id.*

[9] *Id.* at 21:4–22:3.

[10] The Court intends to make no suggestion as to the identity of the CI, so will refer to the CI using only "they" pronouns throughout.

that they also saw a firearm in the video.[11]  At approximately 2:10 p.m., the CI told Lerro that the CI was in the same area as Defendant, at 23rd  and Jessup, and that Defendant still possessed a firearm and was in the same clothing as in the video.[12]

Five minutes later—at 2:15 p.m.—Lerro and several other officers travelled to the scene in an unmarked black Dodge Durango.[13]  Lerro, sitting in the front passenger seat, opened his window on approach, enabling him to hear people calling out the officers' vehicle.[14]  A "call out" refers to people warning others engaged in illegal activity of an incoming police vehicle.[15]

At the scene, Lerro observed the CI in the area, and saw Defendant in the same location as the Instagram video and where the CI indicated they had seen Defendant.[16]  Defendant wore the same clothing he wore in the Instagram video.[17]  Based on the information officers had gathered, Investigator Linkhurst ("Linkhurst") believed Defendant possessed an illegal firearm and conducted a pat down of Defendant.[18]  Linkhurst did not find a firearm on Defendant's person.[19]  The officers

---

[11] *Id.* at 23:14–21, 24:2–16, 27:4–6.
[12] *Id.* at 25:12–26:22.  The CI did not provide any detail about what the gun looked like, where the gun would be found, or who the other individual in the video was.  *Id.* at 25:12–17, 33:8–11, 50:16–51:1, 58:13–16.
[13] *Id.* at 27:19–28:10.
[14] *Id.* at 29:3–10, 29:20–30:2.
[15] *Id.* at 29:13–19.
[16] *Id.* at 33:2–7, 55:1–4.
[17] *Id.* at 34:14–22.
[18] *Id.* at 35:2–9.
[19] *Id.*

then searched the immediate surrounding area because a "call out" often causes individuals to discard contraband before being discovered.[20] The officers found a silver and black handgun with an extended magazine on top of the trash inside a recycle bin about 20–30 feet from Defendant.[21]

After securing the firearm, the officers put Defendant in handcuffs and detained him in the back of a police vehicle.[22] Although the officers believed they had probable cause to arrest Defendant at that time, they did not arrest him.[23] According to Lerro, officers thought it would be better to get Defendant's DNA to confirm that the handgun was in Defendant's possession.[24] The officers transported Defendant to the police station in order to obtain Defendant's DNA.[25]

At the police station, WPD read Defendant his *Miranda* rights.[26] Defendant waived his rights and subsequently offered to provide his DNA without any verbal prompt from officers.[27] Lerro testified that he would have drafted a search warrant if Defendant had not voluntarily consented.[28] After Lerro swabbed Defendant's

---

[20] *Id.* at 35:10–19.
[21] *Id.* at 36:2–5, 36:21–37:7. The CI had not informed the officers that the gun was located in the trash can; the officers located it through a general canvas of the area. *Id.* at 51:15–23.
[22] *Id.* at 37:8–12.
[23] *Id.* at 37:13–19.
[24] *Id.* at 37:17–23.
[25] *Id.* at 38:1–6. Lerro explained that DNA cannot be taken at a street corner, necessitating Defendant's transport to the WPD station. *Id.* at 38:13–22.
[26] *See id.* at 63:3–10; St.'s Ex. 1 (showing body worn camera footage of the interrogation and DNA collection at the police station).
[27] Tr. at 40:1–7. *See also* St.'s Ex. 1.
[28] Tr. at 40:8–11.

cheeks at 3:10 p.m., Defendant was free to leave, but Defendant voluntarily spoke to other detectives about a separate investigation.[29]  Approximately one hour elapsed from the time officers put Defendant in handcuffs to the time Lerro released him from the police station.[30]

At the suppression hearing, Lerro testified about his police report, but it was not entered into evidence.[31]  Several details that Lerro testified to were not included in his police report, including: where Defendant was located;[32] the identity of the other individual in the Instagram video, or if police knew the individual;[33] that the CI confirmed unprompted by Lerro– at 2:10 p.m.[34] – Defendant was at the location of the video, wearing the same clothing as the video, and possessed a firearm;[35] or that Lerro and the CI communicated by text message, or the details of those text messages.[36]  Lerro credibly explained his testimony was based on his own memory, the report, and his review of the text messages with the CI before the hearing.[37]

---

[29] *Id.* at 40:17–41:9.
[30] *Id.* at 41:18–23.
[31] *See, e.g.*, *id.* at 46:23–47:1.
[32] *Id.* at 64:8–10.
[33] *Id.* at 64:17–20.
[34] *Id.* at 27:15–17.
[35] *Id.* at 64:23–65:9.
[36] *Id.* at 47:11–23.  The State noted that it did not provide the text messages as evidence to protect the confidentiality of the CI.  *Id.* at 70:12–22.
[37] *Id.* at 48:19–49:3.

The results of the DNA testing from the gun revealed that Defendant's DNA matched the DNA retrieved from the handgun collected at the scene.[38] WPD subsequently arrested Defendant on December 18, 2023 for Possession of a Firearm by a Person Prohibited and Possession of Ammunition by a Person Prohibited.[39] Defendant filed his Motion to Suppress on April 12, 2024. The State filed its Response to Defendant's Motion to Suppress on May 22, 2024. Defendant filed his Reply to the State's Response on June 6, 2024. The Court held oral argument on June 7, 2024 and reserved decision. For the reasons that follow, the Motion to Suppress is denied.

### III.   ANALYSIS

The State bears the burden of proving that the officers' actions complied with the United States Constitution, the Delaware Constitution, and Delaware law.[40] Defendant seeks suppression of his DNA asserting that his consent to give the DNA was fruit of an unconstitutional stop and detention.[41] Defendant does not dispute that the *Miranda* warnings were proper, or that Defendant's consent given was in any way coerced or involuntary.[42] The State concedes if the stop and detention of

---

[38] *See* Def.'s Mot. at 5.
[39] *Id.*
[40] *E.g.*, *Hunter v. State*, 738 A.2d 558, 560 (Del. 2001) (internal citations omitted).
[41] Def.'s Mot. at 5; Tr. at 63:3–10.
[42] Tr. at 63:3–10.

Defendant were improper, then the resulting consent and DNA is inadmissible.[43]

Both sides agree the officers needed reasonable articulable suspicion to stop and detain Defendant without a warrant.[44]  To defeat the Motion to Suppress, therefore, the State must prove that the initial stop of Defendant and subsequent transport to the police station to collect Defendant's DNA was lawful.

## A.   THE LEGAL STANDARD FOR REASONABLE ARTICULABLE SUSPICION

An officer can stop a person "who the officer has reasonable ground[45] to suspect an individual is committing, has committed or is about to commit a crime."[46] Pursuant to 11 *Del. C.* § 1902:

> (a) A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination.
> (b) Any person so questioned who fails to give identification or explain the person's actions to the satisfaction of the officer may be detained and further questioned and investigated.
> (c) The total period of detention provided for this section shall not exceed 2 hours.  The detention is not an arrest and shall not be recorded as an arrest in any official record.  At the end of the detention the person so detained shall be released or arrested and charged with a crime.

---

[43] *Id.* at 74:17–20 ("If your Honor finds there wasn't enough to transport him back to WPD and he was detained illegally, then the consent goes out the window.").

[44] Def.'s Mot. at 5; St.'s Opp'n at 5.  The State also argued that the officers had the higher standard of probable cause to arrest Defendant given the totality of the circumstances, but the Court will not address this argument since the Court disposes of the issue on reasonable suspicion grounds. *See* Tr. at 65:14–23.

[45] "For the purpose of this analysis, 'reasonable ground' as used in Section 1902(a) has the same meaning as reasonable and articulable suspicion." *Jones v. State*, 745 A.2d 856, 861 (Del. 1999).

[46] 11 *Del. C.* § 1902(a).

8

Pursuant to 11 *Del. C.* § 1903, the officer can search the person "whenever the officer has reasonable ground to believe that the officer is in danger if the person possesses a dangerous weapon."

"Reasonable suspicion" is "the officer's ability 'to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrants the intrusion.'"[47] The court considers "whether the totality of the circumstances supports any reasonable and articulable suspicion for the detention."[48] The analysis is done "through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[49]

A warrant is generally required before an officer can search a person.[50] The *Terry* stop and frisk is an exception to the warrant requirement.[51] A *Terry* stop and frisk is permissible when "officers have reasonable, articulable suspicion that a suspect is armed and engaged in criminal activity."[52] The officers are "empowered

---

[47] *Holden v. State*, 23 A.3d 843, 847 (Del. 2011) (quoting *State v. Henderson*, 892 A.2d 1061, 1064–65 (Del. 2006)).

[48] *Lecates v. State*, 987 A.2d 413, 417 (Del. 2009) (citing generally *Terry v. Ohio*, 392 U.S. 1 (1968)).

[49] *Jones*, 745 A.2d at 861 (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

[50] *See e.g.*, *Garnett v. State*, 308 A.3d 625, 641 (Del. 2023) (citing U.S. Const. Am. IV; Del. Const. Art. I, § 6) (reviewing both the Delaware and United States Constitutions and the protection against unlawful searches).

[51] *Moore v. State*, 997 A.2d 656, 666–67 (Del. 2010) (citing generally *Terry*, 392 U.S. 1).

[52] *Flowers v. State*, 195 A.3d 18, 23 (Del. 2018). *See also Holden*, 23 A.3d at 847 (citing *Henderson*, 892 A.2d at 1064) ("[A]n officer is justified in 'frisking' an individual only if the officer has reasonable articulable suspicion that the individual is armed and presently dangerous.").

to 'take necessary measures to determine whether [an individual] is in fact carrying a weapon and to neutralize the threat of physical harm.'"[53]  The use of force to conduct the search may be justified depending on several factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[54]

**B.    THE STOP AND SEARCH OF DEFENDANT WAS SUPPORTED BY REASONABLE SUSPICION.**

The State relies on several facts to argue Lerro had reasonable suspicion to believe Defendant was or had engaged in illegal activity.  Lerro observed the Instagram video where he perceived Defendant to be holding either a firearm or a magazine despite being a person prohibited.[55]  The CI—a past proven reliable informant supporting at least five arrests[56]—also observed the video and drew the same conclusion, and also followed up with Lerro after the CI observed Defendant, in the same clothing, in the same location, and in possession of a firearm.[57]  The State also points to the "call out" that occurred prior to officers observing Defendant

---

[53] *Flowers*, 195 A.3d at 28 (quoting *Terry*, 392 U.S. at 24).
[54] *Graham v. Connor*, 490 U.S. 386, 396 (1989).
[55] St.'s Opp'n at 7.
[56] Tr. at 26:23–27:14.
[57] St.'s Opp'n at 8; Tr. at 23:14–25:15.

as a factor the Court should consider.[58]  A final factor is the behavior of Defendant in the video, including Defendant "shooting a fake gun."[59]

Defendant relies primarily on *Riley v. State*[60] to contest that the officer's observance of "what appears to be a firearm" supports reasonable articulable suspicion to stop Defendant.[61]  In *Riley*, officers stopped the defendant after witnessing "some type of exchange" between the defendant and two unidentified females in his car in the parking lot of a liquor store.[62]  The officers, however, "were unable to identify any particular objects passed by the [car's] occupants."[63]  The Supreme Court noted there was

> no evidence that the area was the focus of special attention because of drug sales.  There was no evidence that the officers had observed a drug sale in that area before defendant's stop.  There was no evidence the conduct observed was consistent with conduct the officers had observed in prior drug transactions.  There was no evidence of any exchange of money or any other item.[64]

Thus, the only suspicion of criminal activity was "the location of the two apparently underage women and [the defendant] in the parking lot of a liquor store."   The Supreme Court held that the defendant's "mere presence in a shopping center being monitored for underage liquor sales" did not equate to reasonable articulable

---

[58] St.'s Opp'n at 8–9.
[59] Tr. at 20:3–7.
[60] 892 A.2d 370 (Del. 2006).
[61] Def.'s Mot. at 6.
[62] 892 A.2d at 372.
[63] *Id.*
[64] *Id.* at 376.

suspicion and that the "observations of the officers were all consistent with innocent behavior."[65]

The same cannot be said here. While the Court, despite its best efforts, is unable to make out a firearm (or any part of a firearm) on Defendant's waist in the video, this does not end the analysis. This is because the determination of reasonable suspicion is evaluated based on the totality of the circumstances viewed through the officer's eyes, and not the Court's.[66] The Court notes Lerro testified credibly at the Suppression Hearing that he saw the gun on Defendant's waist covering up the "Nike" on the waistband of his compressions.[67]

The Court considers the following facts, along with Lerro's observation of the Instagram video: Defendant's imitation of shooting a gun with his hands in the video, the timing of the video's posting in relation to the search (*i.e.*, that the video was posted within hours of the search on the same day),[68] Defendant's clothing matching his clothing in the video, the "call out" by neighbors as the officers approached,[69] and the CI's statements to Lerro after going to the video's location

---

[65] *Id.* at 378.

[66] *Jones*, 745 A.2d at 862; *Purnell v. State*, 832 A.2d 714, 719–720 (Del. 2003) (holding that "[c]ourts will defer to the experience and training of police officers.").

[67] Tr. at 21:4–13. Lerro testified that he watched the video approximately five times.

[68] The Court does acknowledge that the video was not a "live" video and that the State did not provide evidence that the video was taken on the same day as it was posted.

[69] A "call out" can be a factor in the reasonable suspicion analysis. *See, e.g.*, *State v. Rollins*, 922 A.2d 379, 385 (Del. 2007) ("[T]he focused warning shout 'five-O' contributed to the police officers' reasonable suspicion that the [suspect] might be engaged in criminal activity.").

and personally observing Defendant in the same clothes, with a firearm. All of these facts taken together support a finding of reasonable suspicion that Defendant was "committing, has committed or is about to commit a crime."[70]

Defendant also criticizes the reliance on the CI for a variety of reasons.[71] The Court notes that Lerro's police report failed to include multiple details about the CI, causing Defendant to be able to clarify these details for the first time at the Suppression Hearing.[72] While the Court would have benefited from having the text messages redacted and presented into evidence, the Court does not find that Lerro is not credible for not reading the text messages into the record. The Court, therefore, relies on the veracity of Lerro's statements as to the CI's past proven reliability, the contents of the tips provided that day, and the details those tips included.

Defendant concedes the CI was past proven reliable, but criticizes the CI's tip for failing to describe the gun, who the other individual was in the video, or where the gun could be found.[73] The State, relying on the CI's past proven reliability, asserts that the CI needed to only provide a "certain amount of detail" to support a finding of reasonable suspicion.[74]

---

[70] 11 *Del. C.* § 1902(a).

[71] *Id.* at 6–7. The Court notes there were discrepancies in briefing over the details of the CI's tip as a result of the failure to provide sufficient detail in Lerro's police report. Lerro testified to the details of the CI's tips, timing, and contents at the hearing.

[72] *See supra* Section II (detailing the omissions in Lerro's report).

[73] Tr. at 58:8–16, 59:5–9.

[74] St.'s Opp'n at 12 (quoting *State v. Fullman*, 2024 WL 1759144, at *6 (Del. Super. Apr. 24, 2024)).

13

The Supreme Court of Delaware in *Purnell v. State* upheld a stop under similar circumstances based on a reliable informant's tip.[75] There, the informant was "known to the police as a source of reliable information."[76] The Supreme Court distinguished this past proven reliable informant from anonymous informants in other cases.[77] This informant provided a tip with a detailed description of two black males, their location, their clothing, and their possession of narcotics and handguns."[78] Officers observed one of the men, the defendant, in the vicinity the reliable informant provided.[79] They also noticed that he matched the physical description in the informant's tip, so officers stopped and arrested the defendant.[80] As a result, under the totality of these circumstances, the Supreme Court found that the officers had reasonable suspicion to stop the defendant.

Similar to *Purnell*, the CI here provided a detailed description of an individual that matched the Defendant and Defendant's precise location.[81] Moreover, the officers corroborated the content of the tip provided when they arrived on the scene and observed Defendant wearing the same clothing and in the same location.[82] The

---

[75] 832 A.2d 714, 720 (Del. 2003).
[76] *Id.*
[77] *Id.* Distinct from investigations arisen from a tip from an anonymous, unfamiliar informant, investigations based on tips from reliable informants are more likely to support a finding of reasonable articulable suspicion. *See Adams v. Williams*, 407 U.S. 143, 146 (1972).
[78] 832 A.2d at 716–717.
[79] *Id.* at 720.
[80] *Id.* at 717–718, 720.
[81] Tr. at 25:12–26:19.
[82] *Id.* at 33:12–34:22.

failure of the CI to describe the gun Defendant allegedly had does not undermine the other corroborated facts, or the CI's past proven reliability. Like in *Purnell* where the informant reported the defendant possessed illegal drugs, the CI's tip asserting that they saw a gun on Defendant (along with the other detailed information from the CI) here is enough to support reasonable suspicion to stop Defendant.[83] The Court, therefore, holds that the stop and frisk of Defendant was constitutional because it was supported by reasonable articulable suspicion.[84]

## C.     THE DETENTION AND TRANSPORTATION OF DEFENDANT WAS SUPPORTED BY REASONABLE SUSPICION.

In general, a lawful "investigatory detention must be minimally intrusive and reasonably related in scope to the circumstances justifying the interference."[85] More specifically, officers' transportation of a suspect to another location is lawful only when it is "reasonable and necessary."[86]

In *State v. Kang*, officers transported the defendant to a controlled location, away from the scene of a car accident killing the defendant's friend, in order to conduct a sobriety test.[87] The officers concluded that not only did the scene of the

---

[83] *See Purnell*, 832 A.2d at 720 ("The informant in Purnell's case was known to the police as a source of reliable information. Furthermore, the informant gave a detailed description of what each of the males was wearing and the activity they were engaging in.").

[84] *See, e.g.*, *Id.* at 721 (upholding a *Terry* search for weapons where the "informant had relayed to the officers that the men were armed").

[85] *State v. Kang*, 2001 WL 1729126, at *7 (Del. Super. Nov. 30, 2001).

[86] *Id.*

[87] *Id.* at *3.

15

accident pose a safety hazard, but also the location could hinder the defendant's performance on a sobriety test.[88]  The Superior Court held it was "reasonable and necessary" to transport the defendant elsewhere for the sobriety test because the roadway was at an incline, it was dark, there was a large crowd, and the defendant's deceased friend was still at the scene.[89]  The court held that, "[u]nder the circumstances," the officer's  "transportation of Mr. Kang to the hospital to administer field sobriety tests did not convert the investigatory detention into an arrest."[90]

The facts here are distinguishable from *Kang*.  Unlike *Kang*, where the officers transported the defendant for his own benefit and safety,[91] Lerro did not raise similar concerns for Defendant.[92]  The defendant in *Kang* had also already admitted some responsibility, stating he had several drinks before driving; Defendant here did not admit to possessing a firearm.[93]  The Court also acknowledges the emotionally charged situation of a death-causing accident which is inapplicable to Defendant's situation.

Nevertheless, officers here could transport Defendant to collect his DNA. Despite the factual differences from *Kang*, the totality of the circumstances leads the

---

[88] *Id.* at *7–8.
[89] *Id.* at *8.
[90] *Id.*
[91] *Id.* at *8 (describing the defendant as hysterically emotional).
[92] *Id.*
[93] *Id.* at *7.

Court to conclude that WPD's transport of Defendant to the WPD station to collect his DNA was "minimally intrusive and reasonably related in scope."[94] Officers did not put Defendant in handcuffs or transport him until after they found a handgun on top of the trash in a recycling bin.[95] Given the officers' awareness that people on the street "called out" the officers' arrival, a reasonable person in the officers' position after finding the gun could believe that Defendant disposed of it nearby.[96] Rather than immediately arresting Defendant, Lerro reasonably decided to continue the investigation by attempting to obtain Defendant's DNA to determine a possible connection with the gun.[97] Transporting the Defendant to obtain DNA was necessary because DNA testing cannot be performed on the street.[98]

Defendant argues that his transportation to the police station was unjustified, intrusive, and should not have happened.[99] Defendant relies on *Hicks v. State*[100] to support his position. The Supreme Court of Delaware in *Hicks* reversed a denial of a motion to suppress evidence after an officer transported a defendant to continue an investigation.[101] In *Hicks*, an officer approached a vehicle for a traffic violation in a

---

[94] *Hicks v. State*, 631 A.2d 6, 12 (Del. 1993).
[95] Tr. at 37:8–12.
[96] *See id.* at 29:9–19.
[97] *See id.* at 65:19–23.
[98] *Id.* According to Lerro, the DNA kits "are stored at the police department in a secure office in a sealed Zip-Lock baggie. And once we get down to the police station, we will obtain a DNA kit." *Id.* at 38:9-12.
[99] *Id.* at 60:17–21, 63:3–10.
[100] 631 A.2d 6 (Del. 1993).
[101] *Id.* at 12.

high-crime area.[102] As the officer spoke to the driver, the defendant approached the officer with his hands in his pockets and a crowd behind him.[103] The officer, concerned that the defendant may be armed, conducted a pat down of the defendant.[104] The officer felt a large bulge on the defendant's person and discovered it to be a small pouch.[105] Inside the pouch, the officer did not see a firearm, but found money and a sandwich bag.[106] The officer transported the defendant to another location to continue investigating "to avoid any potential threat from the growing crowd."[107] The officer then placed the defendant in his police vehicle and drove him to a hardware store approximately one-half mile away.[108] The officer then re-examined the pouch and found cash and crack cocaine in the plastic bag.[109]

On appeal, the Supreme Court held that the officer had reasonable articulable suspicion the make a *Terry* stop.[110] Thus, the "essential question remaining" was whether the officer "exceeded the proper scope of [defendant's] detention."[111] The Supreme Court held that "[o]nce the pouch was removed, seized and inspected by the arresting officer, no reasonable basis remained to believe that [the defendant]

---

[102] *Id.* at 7.
[103] *Id.* at 7–8.
[104] *Id.* at 8.
[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Id.* at 9–10.
[111] *Id.* at 10.

was presently armed and dangerous."[112]   Therefore, "the officer's decision to reexamine the contents of the pouch without articulating any reasonable basis to believed it contained a weapon exceeded the permissible scope of the safety search authorized under 11 *Del. C.* § 1903 and *Terry v. Ohio.*"[113]

Defendant relies on *Hicks* to argue that once the officers patted down Defendant and did not find a firearm on him, the officers needed a search warrant to transport Defendant to the station.[114] *Hicks*, while instructive, is distinguishable from Defendant's circumstances.  In *Hicks*, the basis for the initial encounter was a traffic stop of a separate individual, [115] whereas here Defendant was always the focus of the investigation.[116]  The defendant then approached the officer, and the officer believed defendant was a safety threat.[117]  The officer then transported Hicks to the hardware store to continue his search of the pouch, rather than continuing the original intention of searching defendant for a weapon pursuant to Section 1903.[118]

In contrast to *Hicks*, Defendant's stop, search, and eventual transportation all related to the investigation of an unlawfully possessed firearm.  The record indicates

---

[112] *Id.* at 11.
[113] *Id.*
[114] Tr. at 61:17–21.  The Court notes that the State provided no case more similar factually than *Hicks*, instead relying on *Hicks* only for the reasonable and necessary standard.  *See id.* at 66:10–67:6.  Defendant challenged *Hicks* for its factual differences, but cites no case providing a different standard for the Court.  Def.'s Reply at 3–4.
[115] 631 A.2d at 7.
[116] *See* Tr. at 76:10–12.
[117] 631 A.2d at 8.
[118] *Id*.

that from the initial stop of Defendant through his consent to have his DNA tested at the police station lasted only approximately 50 minutes.[119] Further, WPD transported Defendant to the police station to continue investigating only *after* a firearm was found nearby.[120] While the officer in *Hicks* could have searched the pouch at the scene, the officers here could not have taken Defendant's DNA on the street.[121] The transportation had the specific purpose of further investigating the firearm.

The Court holds that based on the totality of the circumstances, it was reasonable and necessary for the officers to transport Defendant to continue investigating after finding a firearm the officers had reason to believe belonged to Defendant. The limited duration of the detention—less than two hours—and the release of Defendant at the conclusion of the intended investigation—the collection of Defendant's DNA—support a finding that the detention was reasonable in scope. The transportation was necessary because DNA could not be taken on the street.

---

[119] Tr. at 30:13, 41:6–9.

[120] *Id.* at 76:19–77:4. The Court notes that the State made multiple arguments as to why the officers chose to transport Defendant, including to avoid interruptions from others on the street while the officers spoke with Defendant, and to hold Defendant while the officers obtained a search warrant if necessary. *See* St.'s Opp'n at 16–17. Lerro only testified that Defendant was detained and transported for the purpose of obtaining DNA, so the Court does not consider these other arguments.

[121] *Id.* at 38:20–22.

## IV.    CONCLUSION

This Court, therefore, finds that the State proved by a preponderance of the evidence that the officers had reasonable articulable suspicion to stop and detain Defendant pursuant to 11 *Del. C.* § 1902.  The detention and transportation were reasonable, necessary, and related in scope to the investigation.  For the foregoing reasons, Defendant's Motion to Suppress is DENIED.

**IT IS SO ORDERED.**

*/s/  Meghan A. Adams*
**Meghan A. Adams, Judge**